W. H. KIRKPATRICK, Appellant, v. MARY A. O. PEASE, CHARLES S. PEASE, WILLIAM REES, ROBERT ROSE, B. F. MEYERS and W. O. PARK.

Division One, March 28, 1907.

1. **SPECIFIC PERFORMANCE: Agent's Authority to Sell: Letter From Owner's Husband.**  The husband of the owner of land wrote to her agent to sell, and she advised with him about the letter, read its contents and it went with her approval. *Held,* that, under the statute (sec. 3418, R. S. 1899), the agent did not have authority to sell the land, although he acted in good faith, under a misapprehension of his power.

2. ———: ———: ———:  **Ratification.**  Notwithstanding the owner gave the agent no written authority to make a contract for the sale of the land, yet as she knew her husband had written a letter authorizing the agent to sell and approved its contents, and knew the agent was acting as her agent in selling it and that he had made a deed therefor in her name, and,

knowing the entire situation, accepted and retained for over a year the entire purchase price, she will be deemed, through such acts, to have ratified the acts of her agent.

3. ——: ——: ——: ——: **Married Woman.** A married woman may make a deed to lands held by her in her own separate right, as her own separate property, the same as a *feme sole*. She may give authority to an agent to contract a sale, and she may ratify a sale made by her agent without specific authority to sell.

4. ——: ——: ——: ——: **Accepting Proceeds.** A married woman, like any other person *sui juris*, cannot, with full knowledge of the facts, receive and appropriate to her own use, without objection, the purchase price of land sold by one assuming to act in her behalf as her agent, without such receipt and appropriation amounting to a ratification.

5. ——: ——: ——: ——: **Recall.** It is axiomatic that the principal, having once ratified the unauthorized acts of an agent, cannot subsequently recall such ratification.

6. ——: **Contract Sufficiently Specific.** The contract of an unauthorized agent to sell land, which is consummated in a deed signed by the agent in his principal's name, which describes the land with particularity, the parties and the price to be paid, and ratified by the principal, is definite and certain enough to be susceptible of specific performance.

7. ——: **Prior Incumbrances: Ownership of Land.** Where the contract was to convey the land subject to certain prior privileges and concessions for a boat house, the court is not called upon to determine whether or not the vendor is the owner of the land covered by those privileges, and no good reason is apparent why the vendor should not be required to convey subject to those privileges, where the vendee seeks only the specific performance of his contract.

8. ——: **Ratification: Subsequent Purchasers: Notice.** If the unacknowledged deed is good in equity, because of the vendor's ratification of the sale, subsequent purchasers with notice of said prior sale, are bound thereby.

9. ——: **When Decreed.** If the contract is fair, just and equitable, a court of equity will decree specific performance; otherwise, the parties will be left to an action at law. Courts of justice sit to enforce the law, and a contract is but a law unto the parties thereto.

10. ——: ——: **Discretion.** Discretion does not mean caprice. It means a sound (that is, a judicial) discretion. Discretion in specific performance cases may be illustrated thus: if the bargain was overkeen and unjust, or if the party against whom

specific performance is sought was laboring under some disability and had been overreached, then there would be something for the discretion of the chancellor to take hold of, something binding on his conscience; but absent any earmarks of unfairness, overkeenness or overreaching, and present a fair, just real estate contract, to deny specific performance would be to wound the soul of equity itself.

Appeal from Platte Circuit Court.—*Hon. A. D. Burnes,* Judge.

REVERSED AND REMANDED (*with directions*).

*Wilson & Wilson* and *George W. Day* for appellant.

(1)  The land in controversy accrued to Mrs. Pease by conveyance in the year 1894. It, therefore, became her separate legal estate, which she could, in her own name, without her husband joining her, engage to sell; and such engagement the courts will respect and enforce. R. S. 1889, secs. 6864, 6869; Bank v. Hageluken, 165 Mo. 443.  (2)  It is not necessary that a contract for the sale of land should be evidenced by one writing, signed by both parties to it. It is sufficient that the same is contained in several writings, signed by the party to be charged therewith, or some other person by him thereto lawfully authorized, in writing. The letters which passed between Mrs. Pease and Park constituted the latter agent for the former to sell this particular tract to plaintiff, at the price paid for it. R. S. 1899, sec. 3418; Moore v. Mountcastle, 61 Mo. 424; Peycke v. Ahrens, 98 Mo. App. 456.  (3)  The instrument which Park signed and delivered to Kirkpatrick as a deed, though, for want of power to make it and failure to acknowledge the same, ineffectual as a conveyance, satisfied the requirements of the Statute of Frauds, touching agreements to sell lands. It set forth the names of the parties, the consideration and the subject-matter of

the contract, and was signed by Park, as agent for Mrs. Pease. Mastin v. Grimes, 88 Mo. 478; Smith v. Wilson, 160 Mo. 657. (4) Even if it should be conceded that plaintiff placed his signature to nothing which could bind him to observe his promises to Mrs. Pease's agent, Park, and that, by reason thereof, there was no mutuality in the contract, such a concession would furnish no ground for refusing specific performance of the contract. Agreements with respect to the sale of land are exceptions to the general rule that courts will not enforce specific performance of contracts when the obligations are not mutual. All that is required in this respect, in the excepted class of contracts, is that the agreement shall be signed by the party to be charged therewith. Ivory v. Murphy, 36 Mo. 534; Mastin v. Grimes, 88 Mo. 478; Warren v. Costello, 109 Mo. 338; Smith v. Wilson, 160 Mo. 657. (5) Defendants Rees, Rose and Meyers had actual and constructive notice of plaintiff's equities; and their purchase, two years after the filing for record of the instrument purporting to convey the land to plaintiff, and after this suit was commenced, is no obstacle in the way of a decree in favor of plaintiff. Farrar v. Patton, 20 Mo. 81; Thompson v. Henry, 85 Mo. 451; Maybee v. Moore, 90 Mo. 340; Eggert v. Dry Goods Co., 102 Mo. 512; Myers v. Schuchmann, 182 Mo. 159; Randolph v. Wheeler, 182 Mo. 145.

*James W. Boyd* and *James H. Hull* for respondents.

(1) There is no evidence to show that the respondent Mary A. O. Pease authorized in writing (or otherwise) W. O. Park to sell or convey the land described in the petition. Sec. 3418, R. S. 1899; Johnson v. Fecht, 185 Mo. 345, 94 Mo. App. 605. (2) Appellant admits in his petition that this pretended deed is without authority and is therefore void. This unauthorized and void paper constituted no agreement to sell

any land to appellant. Any pretended deed made by Park, admitted and alleged by appellant to be void, cannot be construed into an agreement on the part of the respondent to sell lands to appellant. (3) Appellant in his argument claims that this respondent ratified the act of Park by writing the letter of March 27, 1898, that is, by endorsing the draft, which had been sent her. In the case of Johnson v. Fecht, 185 Mo. 346, it is said by this court that "What is hereinbefore said with reference to the certainty required in conferring the written authority upon an agent applies with equal force to a ratification. As so measured, the ratification fails to fill the requirement of the law." Hawkins v. McGroarty, 110 Mo. 546; Roth v. Goerger, 118 Mo. 556. In this case there was no ratification by respondent Mary A. O. Pease. (4) Mary A. O. Pease never owned all the property which her unauthorized agent undertook to sell and convey for her, and even if her agent had been authorized to sell land and had by mistake or inadvertently tried to sell land, and she received the money, and as soon as she found out the mistake, returned the money, no court would compel her to execute a deed, because such a decree would be to compel her to do an impossible act. According to the description of the land which Kirkpatrick desired to buy and which is contained in the unauthorized deed by Park to him, there is included a portion of the boat house, which never belonged to Mrs. Pease. The idea of appellant was that the boathouse, which was originally put over the water, should, as the water receded, be continuously moved so as to keep pace with the recession of the water. Therefore, in the pretended deed there is included a part of the boathouse and of the original site thereof, which Mrs. Pease never owned and which belongs to Mrs. Stephens, the wife of J. T. Stephens, or to some other person. (5) The circuit court further found that there was no evidence sufficient to justify a decree of specific perform-

ance. ''The evidence relied upon for obtaining a decree of specific performance must be so clear and forceful as to leave no room for reasonable doubt in the mind of the chancellor hearing the cause.'' Railroad v. McCarty, 97 Mo. 214; Veth v. Gierth, 92 Mo. 97; Strange v. Crowley, 91 Mo. 287; Taylor v. Von Schraeder, 107 Mo. 207; In re Ferguson Estate, 124 Mo. 574. (6) A decree for specific performance is a matter of judicial discretion. A decree for specific performance is not granted as an absolute right, but rests in the sound discretion of the court. It will only be granted where it would be equitable and necessary to prevent injustice. Shinkle v. Vickery, 156 Mo. 15; Railroad v. Curtis, 154 Mo. 24; In re Ferguson Estate, 124 Mo. 574; Glass v. Rowe, 103 Mo. 513; Pomeroy v. Fullerton, 131 Mo. 592; Veth v. Gierth, 92 Mo. 97; Cable v. Jones, 179 Mo. 614. (7) Respondents Rees and Rose purchased this land, paid the purchase price and obtained a deed thereto after appellant had stated to them, or to Mr. Rose and others, that under the circumstances of the situation he did not own the land, and that ''he did not own it unless J. T. Stephens could be ejected therefrom.'' It seems that Mr. Stephens cannot be ejected therefrom, and therefore according to appellant's own statement he disclaimed any title to the land, and under those circumstances Rees and Rose purchased said land, and afterwards sold it to John Meyers, who now owns the property. Under these circumstances a chancellor would hardly feel it his duty to enter a decree against this respondent for specific performance.

LAMM, J.—Plaintiff lodged a bill in equity in the Platte Circuit Court to enforce specific performance of an alleged contract of purchase of 1.97 acres of land (more or less) being part of the southwest quarter of section 12, township 54, range 37, in Platte county, described in the bill with particularity in

courses, distances and monuments.     This parcel of
land will hereinafter be referred to as "Tract A."
On a hearing, *nisi*, plaintiff's amended bill was dis-
missed.     Thereupon, he appeals to this court.

Attending to the pleadings, the amended bill pro-
ceeds on the theory that defendant Mary A. O. Pease
was the owner in her own exclusive and separate right
of Tract A, an irregular parcel of land on the shores
of Bean Lake, a body of water in said Platte county
(the description of Tract A, being diffuse. and tech-
nical, need not be set forth, but appears correctly in
plaintiff's amended bill); that her codefendant,
Charles S. Pease, is her husband; that there was ex-
cepted out of Tract A a certain indefinite right de-
scribed in the bill as "a right to use, occupy and enjoy
a water front along the water line on the east side of
Bean Lake as conveyed by William Osborne to John
Savage by deed recorded in book 21, page 278, of the
records in the recorder's office of Platte county;" that
said Mary was the granddaughter of Colonel William
Osborne and that during her coverture Colonel Os-
borne conveyed Tract A, together with a very large
body of land, to Mary by a deed of April 6, 1894, duly
of record; that said deed was a gift of inheritance in
lieu of a devise by will; that defendant W. O. Park was
Mary's duly accredited agent, authorized in writ-
ing, "to look after, rent, care for, sell and otherwise
attend to Tract A" and said larger body of land; that
on February 26, 1898, through said Park as agent, in
consideration of $200, she sold said Tract A to plain-
tiff and delivered possession thereof to him, and he
thereupon made valuable improvements; that a deed
to Tract A was made by Park, but the same was in-
sufficient to convey the legal title to plaintiff, but that
Park, as agent, transmitted the consideration to his
principal, Mary, which was by her received with full
knowledge that it was the purchase price of Tract A
and she thereupon ratified and confirmed the act of

her agent in the premises; that Mary's husband, in all said things concerning the sale of Tract A and the ratification thereof, co-operated with her; that plaintiff under said sale, payment of the purchase money, conveyance and delivery of possession, together with the acquiescence of Mary, had rested in the belief that he had a sufficient deed for Tract A, but that a short time before the bringing of this suit defendant Park retired from the said agency and plaintiff was then informed by Mary's new agent (one Petty or Peddie) that Mary's deed was invalid; that thereupon plaintiff was advised by counsel that Petty's contention was true, and plaintiff thereupon applied to Mary for a sufficient deed to rectify the errors in her former conveyance, which, however bad in law, was alleged to be binding in equity and good conscience as a written contract to convey, but that Mary refused to make a sufficient deed, and thereafter, in March, 1900, sold Tract A with other land to her codefendants Rees and Rose, who (in turn) in April of that year, conveyed the same to her codefendant Meyers; that said Rees, Rose and Meyers, collectively and severally, having received their said deeds with full knowledge of plaintiff's equities and claims, are bound thereby. Wherefore, plaintiff prayed a decree adjudicating that Rose, Rees and Meyers took their respective deeds subject to plaintiff's equities; and that said conveyances be held void as to Tract A; and for specific performance and for all proper general relief.

Defendant Park failed to answer, and it is not clear why he was made a party.

Defendants Rees, Rose and Meyers were brought into the case by an amended bill—their deeds having been executed after the original bill was filed.

Mary A. O. Pease answered by way of general denial. Further she specifically denied that her codefendant Park had any authority in writing to sell Tract A or any other land for her; and she avers that

Park sent her $200, but falsely pretended he had sold some land, but not the land described in the petition; that thereupon she declined to accept said sum and "immediately after receiving it, she tendered it with interest thereon, if any, to plaintiff," who refused to accept it; that when this suit was instituted, she renewed her tender and brought said money and interest into court for him.

Defendants Charles S. Pease, Rees, Rose and Meyers answered tendering the general issue, except said Pease admits being the husband of Mary.

The reply denied new matter and reaffirmed the allegations of plaintiff's amended bill that Mary accepted the consideration with full knowledge of all the facts relating to the purchase and kept the same until the institution of this suit, to-wit: for about two years, during which time plaintiff in good faith made valuable improvements on Tract A, because of all which, plaintiff says, Mary is estopped to allege a want of a written contract.

A surveyor's map used at the trial will serve in understanding the facts. The tract marked on that map, "W. H. Kirkpatrick," bisected by a line showing the shore line of Bean Lake in 1840 (as we grasp it) is Tract A. In Tract A and north of the platted road and some distance away from the present water line of Bean Lake is the "boathouse," which figures extensively in the trial. Farther to the east and across a wheat field is a tract marked, "Annie Stephens," which also figured at the trial and will hereafter be designated as "Tract B"—the privilege for said boathouse being appurtenant to Tract B.

Said map was produced in this court as a blue print, and is as follows:

Kirkpatrick v. Pease.

Questions raised on appeal group themselves into the following:

*First,* was there a binding contract made between plaintiff and Mary A. O. Pease?

*Second,* if there was any infirmity in the authority of Park to make the contract, was there such ratification by Mrs. Pease as relates back and binds her?

*Third,* if a contract was made, or ratified, was it so definite and certain as to be susceptible of specific enforcement?

*Fourth,* did Mary A. O. Pease own Tract A, *i. e.,* was her title such as made the contract, if one was made or ratified, susceptible of specific performance?

*Fifth,* did defendants Rees and Rose purchase with notice of plaintiff's equities, if any? And does defendant Meyers now hold under a conveyance subject to such equities?

*Sixth,* specific performance being directed to the sound discretion of the chancellor, should it be withheld in this case?

The facts essential to the consideration of these questions will appear in the opinion.

I. The first and second questions may be considered together. Attending to them paintiff's learned counsel concede there was no valid conveyance by Mrs. Pease to plaintiff, but they contend there was written authority from Mrs. Pease authorizing Park to make a contract; and, further, that the legal effect of what was done by him was to make such contract and they rely on ratification. Defendant's learned counsel argue *contra.* The facts uncovered below on these phases of the case are contained in a long record and cover many writings and matters of detail. Summarized, they are as follows: Park was a banker in Atchison, Kansas, and a relative of Mary A. O. Pease. Bean Lake lies on this side of the Missouri river and southeast of Atchison, in Platte county in this State.

202 Sup—31

Some four years prior to 1898, Mrs. Pease became the owner of about 516 acres of land adjacent to Bean Lake and some of it washed by its waters. Her conveyance was made to her by her grandfather, Colonel William Osborne, a widower residing at Watertown in the county of Oneida, State of New York, as a gift of inheritance. Colonel Osborne (now dead) reserved to himself the income and profits arising from these lands during his natural life. The lands so conveyed included Tract A, but in fact the grant (as appears *aliunde*) was subject to a prior conveyance of Tract B and a certain boathouse permit on Bean Lake, all of which will appear presently. The Peases lived at Upper Montclair in New Jersey; and it is conceded on all sides that during the years 1897 and 1898 Park held a written power of attorney authorizing him to represent Mrs. Pease in the renting and caring for all said real estate. The terms of this power of attorney are such that it is agreed they did not include a power of sale. Under that power Park became her general agent to make improvements, farm or lease the land, collect rents, pay taxes, etc., and was to have all the income in excess of $700. If the revenue of the farm fell below $700, Park was to have nothing. If they went over $1000, Mrs. Pease was to have two-thirds of such excess. By a supplemental and later agreement the recompense of Park as agent was placed at the fixed sum of $12.50 per month; and he agreed to perform the duties of agent and of farm overseer or superintendent, subject to the approval of the owner. In 1897 plaintiff lived on an island in Bean Lake close to Tract A on the shore. We infer he had resided there for many years, kept a fishing and bathing resort there and, under some undisclosed arrangement, had stables and a feed lot, possibly for his own stock, but certainly for the horses of those who came to his resort to bathe and fish, which stables and feed lot covered a part of Tract A and were accessible from his island. The water of Bean Lake had

permanently receded from its ancient bank, leaving the old bank as a bench and serviceable as a shelter for stock; and Kirkpatrick late in 1897 opened negotiations with Park for the purchase of Tract A, and Park commenced a correspondence with his principal, Mrs. Pease, anent that sale. Many letters passed backward and forward, some of them written by defendant Charles S. Pease; but Mrs. Pease read such before they were sent, they expressed her desires and went at her request. During the run of this correspondence, the Peases asked for a description of the tract Kirkpatrick desired to buy. Thereupon Park, on October 17, 1897, enclosed a rough freehand plat which was put in evidence and a blue print thereof was produced here, as follows:

Having sent said diagram, Park with substantial accuracy entered into a detailed explanation of the shores of the lake, the purposes for which Kirkpatrick wanted the tract, the probable shape of the tract itself and the environment. He recommended the sale and suggested the purchase money was needed in improvements. In reply to this letter Mr. Pease wrote in behalf of his wife and under her instructions. The letter seems to be lost and Mrs. Pease, in testifying of its contents, says: "My recollection of its substance is that I instructed Mr. Park to go ahead with the matter if it was all right." Park says of this letter that "she instructed me to make a sale at not less than $40 per acre." It seems the Peases up to this time were not advised of any boathouse permit or any other claims outstanding against Tract A, as will presently be seen; such permit (if existing) originated in a grant by Col. Osborne made prior to his deed to Mrs. Pease. It seems that Park at the beginning was uninformed in that particular. We infer, too, that Mr. Kirkpatrick knew nothing of the character and origin of any adverse claims; but he must have known the boathouse was there. We might as well say now that the record contains unmistakable evidence establishing to our satisfaction that Park acted throughout with a zealous fidelity to the interests of his relative, Mrs. Pease. On the authority of the foregoing correspondence with his principal, Park informed Kirkpatrick he had authority from the Peases to sell him two acres, together with water rights, for $200 cash, giving him a clear title to the same. Presently Mr. Kirkpatrick went to Atchison and turned over to Park his check for the $200 purchase price. Presently, by correspondence with Kirkpatrick, Park arranged to have a survey made, which was done, and the exact description of Tract A was ascertained. Then a deed was drawn and signed by Park as agent for Mrs. Pease; it was in warranty form, described Tract A, and granted all appurtenant ripar-

ian and fishing rights to the lake front, excepting from the grant, "a concession of 40 feet of water front next north of the county road to the K. C. Club for a boathouse." This deed was not acknowledged, but was finally delivered and thereafter was duly placed of record on the 11th day of April, 1898, in the proper office in Platte county. It seems this so-called deed was not delivered at once, that Park had become aware of the boathouse on Tract A, and that it was used by a Mr. J. T. Stephens, the husband of the owner of Tract B. So Park wrote to Mr. Pease so early as January 12, 1898, referring to his (Park's) authority to sell two acres on the shore of the lake and informing him that he had sold it at double the price he was authorized to take, to-wit: $200, but that he had not completed the transfer owing to the presence of a boathouse which must be removed before Kirkpatrick would take it, that the money was in the bank and the deed was made out and he hoped soon to have the land clear. Following that letter he wrote Mrs. Pease on February 14th, telling her that the Kirkpatrick sale still hung fire, that the hitch was over the occupation of a portion of Tract A by one Stephens in violation, or in excess of, his (Stephens') water front privileges, that he hoped for a speedy settlement and would remit the proceeds of the sale as soon as collected. It was in evidence that Park sent Mrs. Pease a copy of the deed he proposed making to Kirkpatrick. Subsequently, on his own initiative, he wrote her the details of a trouble he was having with Stephens, that Stephens had tried to buy Tract A after Kirkpatrick had paid the money. He told her that Stephens had the privilege of building and using a boathouse over the water for forty feet north of the road, and that he (Stephens) had construed that into a right to build his house back on the shore forty feet and run a fence around it. It seems that Mr. Park got into a personal altercation with Stephens and he wrote the particulars of that to Mrs. Pease. He

asked her advice about an injunction and writ of eject-
ment and told her that he had given Kirkpatrick a
warranty deed to the land, but the latter did not want
to mix up in a row with Stephens. He explained to
Mrs. Pease that her grandfather had sold some land,
to-wit: Tract B, to a Mr. Savage for a sportsman's
club, together with a certain water privilege; that
Tract B had passed into the possession of Stephens,
who had built a boathouse and a pen back on the shore
of the lake and had fenced them in. He asked whether
he should remit the proceeds of the sale, or wait until
the matter was ended. He forwarded her a certified
copy of the original deed from her grandfather, Os-
borne, to Savage, under which Stephens claims the
boathouse privilege, and asked her to return it for use
in any further proceedings. Mrs. Pease testified that
she answered this letter and instructed Mr. Park to em-
ploy legal means to eject Stephens from the land. It
will not be necessary to further follow this correspond-
ence, which covered several months. We find there-
from that Park fully notified Mrs. Pease of the situa-
tion of things. We find that armed with this informa-
tion she, by letter, ordered the proceeds of the sale
sent to her. They were sent by draft. She accepted
them with a substantial knowledge of all the facts, and
the draft passed through the usual banking channels
and was in evidence bearing her indorsement. These
proceeds she kept for nearly two years and until she
was made to believe that the transaction was inimical
to her interests. After the receipt of the purchase
money, she instructed Park that legal steps be taken
to drive Stephens off the land. Attorneys were hir-
ed and their fees paid by Mrs. Pease and such steps
taken. In March, 1899 (a year later), Park was order-
ed to suspend all legal action until further notice. Fol-
lowing that, in May or June, 1899, Mrs. Pease employ-
ed a new agent, Alexander Peddie, of Emmetsburg,
Iowa. Mr. Peddie came upon the ground, studied the

situation and made a report to Mrs. Pease. Influenced by this report, the Peases changed their minds and instructed Peddie to tender back to Kirkpatrick the purchase money of Tract A, which was done in January, 1900, and Peddie asked Kirkpatrick to quitclaim. Kirkpatrick refused the tender and refused to make the deed. After this tender and after Kirkpatrick was informed by Peddie that his deed was not valid, Kirkpatrick complained to Park and Park wrote Mrs. Pease, going over the whole controversy and refreshing her mind in certain particulars, telling her that he had made the sale and that she had confirmed it, that a suit was threatened by Kirkpatrick but that he had prevailed upon Kirkpatrick's lawyers to wait a little longer as the trouble was through a misunderstanding. He forwarded her a deed to execute to Kirkpatrick, or, if she preferred, she could send him (Park) a power of attorney dated back to the date of the original deed. Mrs. Pease ignored this letter. Thereupon suit was brought, and following that the Peases (through Peddie) sold 54 acres of land, including Tract A, to defendants Rees and Rose; and Rees and Rose in turn conveyed to defendant Meyers, subject to an exception in both deeds, viz: "Excepting water front privilege described in deed of William Osborne to John Savage, dated April 4, 1891, which deed is recorded in book 21, page 278, of Platte county, Missouri, records."

The record shows that in March, 1898, Kirkpatrick was put in possession of Tract A by Park, except of the boathouse and a small inclosure there, and Mrs. Pease knew of this, that he substantially fenced it and built stabling thereon, and, barring the boathouse, was in possession at the date of the trial.

The foregoing record justifies the following observations:

(a) It will be seen that the original authority in Park to sell to Kirkpatrick is traced back to a letter. This letter was not signed by Mrs. Pease, but by her

husband. She advised with her husband about the letter, she read its contents, and testified it went with her approval.

Section 3418, Revised Statutes 1899, reads: "No action shall be brought . . . . upon any contract made for the sale of lands . . . . unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized, and no contract for the sale of lands made by an agent shall be binding upon the principal, unless such agent is authorized in writing to make said contract." Now, Charles S. Pease held no written authority from Mary; hence, authority from him to Park to sell Mary's land was not authority in writing from Mary. So that, conceding an agent could be clothed with authority by letter, and conceding, moreover, that authority might be spelled out of several letters in a correspondence (Peycke Bros. v. Ahrens, 98 Mo. App. 456, and authorities cited), yet the facts at bar bring this case within the mischief struck at by the foregoing statute, and we cannot hold that Park originally had lawful authority to sell the land of Mary Pease to Kirkpatrick. And this is so, although Park acted in good faith, under a misapprehension of his power.

A case might arise where there was an infirm power based on authority such as the foregoing, where, with the knowledge and acquiescence of the owner of the land, improvements were made by the purchaser and he so materially changed his situation that an equitable estoppel would be created, and an owner who had refused to speak "when in conscience he should have spoken," would not be allowed to speak, "when in conscience he ought not" to deny written authority. But the facts in this case do not warrant the application of any such doctrine.

(b)   Notwithstanding Mrs. Pease gave no written

authority to Park to make a contract to sell Tract A, yet fairly construing the correspondence between her and Park, giving weight to the knowledge she had that Park was acting as her agent in selling Tract A and had made a deed therefor in her name (she thereafter accepting the full purchase price), considering, too, the information given to her with a copy of the deed in hand, she ought not to be allowed in writing to order the proceeds turned over to her and to put the same in her pocket, without such acts, based on such knowledge, being taken and deemed a ratification of Park's acts.

A married woman, as our statutes now run, is clothed with the right to sell lands held by her in her own separate right as her own separate property. [Farmers Exchange Bank v. Hageluken, 165 Mo. 443; R. S. 1899, secs. 4335, 4340.] She may make a deed thereto as a *feme sole;* hence, she may give authority to an agent to contract a sale, and it follows that she may ratify the act of her agent. The ratification of an act, done by one assuming to be an agent, relates back, and is equivalent to a prior authority. [Story on Agency (9 Ed.), sec. 242; Despatch Line of Packets v. Bellamy Man. Co., 12 N. H. l. c. 232.] The authority to contract a sale of real estate must be in writing; therefore (it is held), the ratification must be in writing, where ratification is relied on to make a binding contract. [Hawkins v. McGroarty, 110 Mo. 546; Mechem on Agency, sec. 136; Johnson v. Fecht, 185 Mo. l. c. 345, *et seq.*]

No one (*sui juris*) may, with full knowledge of the facts, receive and appropriate to his own use without objection the purchase price of land sold by one assuming to act in his behalf as his agent, as Mrs. Pease did here, without such receipt and appropriation amounting to a ratification. [Mechem on Agency, sec. 149, and cases cited in note 2.] And, having once ratified the act, it is axiomatic that such ratification may not be recalled.

II.    Was the contract so definite and certain as to be susceptible of specific enforcement? We think so. Tract A is described with particularity in the infirm deed, signed by Park for Mrs. Pease; the parties are set forth, and the price to be paid. The terms of the contract evidently were cash in hand; and no reason appears why the contract was not so definite and certain in its terms as to be susceptible of specific performance.

III.    Did Mrs. Pease own Tract A — *i. e.,* was her title such as made the ratified contract susceptible of specific performance? In considering this question regard must be had to certain record facts to be presently uncovered, to-wit: In 1891, some three years prior to his conveyance to Mrs. Pease, Colonel Osborne conveyed Tract B to one John Savage. It is assumed in the record that this conveyance was made to Savage to aid in establishing a sportsmen's club at Bean Lake. After describing Tract B by metes and bounds, the deed proceeds thus: "Together with the water front privileges appurtenant thereto." As Tract B lies on the far side of a wheat field from Bean Lake, it is not plain to either a landsman or a waterman, from the naked grant without evidence *aliunde,* what "the water front privileges appurtenant thereto" may be. But the Savage deed did not stop there; it goes on thus: "Also, the right to perpetually use, occupy and enjoy a water front along the water line on the east side of Bean Lake, immediately north of the county road, along the south line of said section twelve for the construction of a boathouse over the water of said lake, of the length of forty feet along said water line."

The privilege aforesaid will be hereafter referred to as "Permit C." Presently thereafter, Savage conveyed Tract B to the "Bean Lake Fishing & Hunting Club," and this conveyance included Permit C. In 1894 the Bean Lake Fishing & Hunting Club (which seems to have been known locally as a Kansas City

Club) conveyed Tract B to secure a note signed by J. T. Stephens for $400, due in twelve months. The conveyance was a deed of trust in the nature of a mortgage and did not purport to convey the privileges set forth in Permit C. Presently the trustee sold the premises under the foregoing deed of trust to Annie E. Stephens, the present owner; and the trustee's deed conveyed Tract B, but did not include the privileges set forth in Permit C. We infer that the Stephens referred to in the record as J. T. Stephens, is the maker of said note and the husband of Annie E., and that he is the party who, claiming under the trustee's deed to his wife, the Savage deed and the aforesaid mesne conveyances, is occupying the boathouse on Tract A.

On such record hinges the contention of defendants that Mrs. Pease cannot make a valid conveyance to Tract A, and, therefore, whatever remedy Kirkpatrick may have, he cannot enforce specific performance.

But without deciding whether a vendee might not be entitled to part performance with satisfaction in damages for the part not performed, yet it is sufficient to say of this contention for the purposes of this case that it proceeds upon a misapprehension. If we hold that the unacknowledged deed executed by Park for Mrs. Pease is not good as a conveyance, which we do, yet if said abortive deed is good in equity as a contract to convey, which we also hold—then it will be seen that there was an exception reserved in the contract and that Kirkpatrick agreed to take title subject to "a concession of forty feet of water front next north of the county road to the K. C. Club for a boathouse." This is self-evidently the same concession granted in Colonel Osborne's deed to Savage and in Savage's deed to the Bean Lake Fishing & Hunting Club, to-wit: Permit C—subject to which Mrs. Pease (holding under a subsequent deed) took title. It is, furthermore, the same exception contained in the Peases' deed to Rees and Rose, and in their deed to

Meyers. So that, we are not called upon to pass upon Stephens' right under the trustee's deed to enjoy the privileges of Permit C. Whether that right is existent ought not to be determined in this case—Mrs. Stephens and her husband not being parties; nor does the case call for such determination, because, if the Stephens are entitled to the boathouse privileges of Permit C, then, under his contract, Kirkpatrick takes title subject to that privilege; and as the Peases conveyed Tract A with other land to Rees and Rose, subject to that privilege, no good reason is seen why they might not have conveyed Tract A to Kirkpatrick subject to the same privilege—consistency being a jewel, and inconsistency not. We see no insuperable obstacle to specific performance on this score.

IV. Plaintiff's counsel insist that Rees, Rose and Meyers took a title burdened with notice of plaintiff's rights. This is so. In fact, defendants' learned counsel do not argue that Rees, Rose and Meyers were not put upon inquiry and had no notice. They admit notice, but they say inquiry and notice amount to nothing unless plaintiff's claims were substantial and enforceable in equity. They say (in substance) that plaintiff's rights have no substance, that plaintiff has no standing in court, and, therefore, they bought with indifference and impunity, relying on the court's brushing aside any apparent interest in plaintiff. But, as we have seen, they were mistaken in this and (*ergo*) must be held to take title subject to plaintiff's equitable right to specific performance, unless specific performance should be denied on a ground now to be considered.

V. Finally, we are asked to sustain the judgment because specific performance is not a matter of absolute right, but rests in the discretion of the chancellor. In a sense specific performance does rest in the discretion of the chancellor. But discretion does not mean

caprice. A discretion measured by a capriciously elastic yardstick would present a false measure of equitable right. This discretion is spoken of in the books as a sound discretion—*sound*, meaning judicial. The right doctrine is elegantly put by WAGNER, J., thus: "A bill for the specific performance of a contract is not granted as a matter of right by the court to which it is addressed, but from a just and reasonable discretion. But this discretion is not to be exercised in an arbitrary or capricious manner, but is to be governed by sound legal rules and principles. If, upon a whole view of the facts and circumstances, the court shall be of the opinion that the contract is fair, just and equitable, it will use its extraordinary authority and decree specific performance; but, if, on the contrary, it appears inequitable and unjust, the remedy will be denied and the party left to his action at law." [Ivory v. Murphy, 36 Mo. l. c. 542.]

Courts of justice sit to enforce the law. Now, the law may be said to be a general rule of action—a rule of civil conduct prescribed by the supreme power in a State. A contract is but a rule of action binding upon the parties thereto—*i. e.*, a contract is but a law unto the parties thereto. Therefore, courts sit to enforce contracts—not to abrogate them. [Evans v. Evans, 196 Mo. l. c. 23; Kilpatrick v. Wiley, 197 Mo. l. c. 172.] If (for instance) the bargain in this instance was overkeen and unjust, or if the party against whom specific performance was sought was laboring under some disability and had been overreached, then (or in similar cases) there would be something for the discretion of the chancellor to take hold of—something binding his conscience. But, absent any earmarks of unfairness, overreaching or overkeenness (as here) and present a fair, just real estate contract (as here), to deny specific performance is to wound and vex the soul of equity itself.

In our opinion the judgment, *nisi*, was for the

wrong party. That judgment is, accordingly, reversed and the cause remanded with directions to the chancellor to set aside the judgment dismissing plaintiff's amended bill and to enter a decree for specific performance in favor of plaintiff, divesting the legal title to tract A (describing it) out of the defendants Meyers, Rees, Rose, and the Peases, and each and every of them, and vesting it in plaintiff.

All concur, except *Woodson, J.*, not sitting.