# American Seeding Machine Co. v. Commonwealth.

(Decided March 4, 1913.)

## Appeal from Barren Circuit Court.

1. Constitutional Law—Class Legislation.—Section 3915 as amended by section 3941-a, Ky. Stats., legalizing the pooling of products is not in violation of the V., or the XIV Amendments of any other provision of the Constitution of the United States.

2. Commerce—Subjects of Regulation—Sale of Goods.—The execution in this State, by a resident thereof and by an agent, for and on behalf of a non-resident, of a writing purporting to sell certain articles therein designated and containing stipulations governing sales by one party to the other, throughout the ensuing year, evidences sales made in this State and not interstate transactions.

3. Principal and Agent—Rights and Liabilities as to Third Persons—Ratification—Effect of.—A ratification by the principal of an act of his agent in making a contract has the same effect as if the agent originally had authority to bind his principal to such contract, and the latter speaks from the date of its execution.

4. Monopolies—Trusts and Other Combinations in Restraint of Trade—Combinations Prohibited—Sale of Goods.—Where manufacturers combine and obtain a practical monopoly of, and maintain a uniform price for, its products, such acts are condemned as being in restraint of trade, but are not in violation of the anti-trust laws of this State.

5. Monopolies—Trusts and Other Combinations in Restraint of Trade—Criminal Prosecutions.—In a prosecution under the anti-trust laws, where the proof shows a combination of producers of seeding machines by which such product is controlled by the combination, that the market price of same has materially enhanced, that the manufacturing conditions remained unchanged, other than the increased cost of labor which was more than offset by concentration of plants and a reduction in the marketing expense, the jury was warranted in finding the purpose of the combination was to raise the price of such commodities above their real value.

HUMPHREY, MIDDLETON & HUMPHREY, J. E. BOWMAN and PORTER & SANDIDGE for appellant.

JAMES GARNETT, Attorney General, CARROLL & CARROLL, T. C. CARROLL, FRANK E. DAUGHERTY and BAIRD & RICHARDSON for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

This is an appeal from a judgment of the Barren Circuit Court upholding the verdict of a jury finding the

American Seeding Company guilty of violating sections 3915 and 1941-a of the Kentucky Statutes, commonly known as the anti-trust laws of this State, and fixing its punishment at a fine of $500.00. The proceeding was by penal action. The petition charges that, within the year next before the instituion of this suit, the American Seeding Machine Company, an Ohio corporation, combined with five other named corporations or companies engaged in the manufacture of seeding machinery, and other similar corporations, the names of which were unknown, to control the price of seeding machinery, and, in pursuance of said arrangement, sold and offered for sale seeding machinery in Barren County, Kentucky, above the real value of such machinery. The defendant demurred to the petition. This being overruled, it entered a plea of "not guilty." The case thereupon proceeded to trial, and, at the close of plaintiff's evidence, the defendant moved the court to instruct the jury to find in its favor, upon the idea that these sections of the statutes, under which the prosecution was being conducted, were violative of the Fifth and Fourteenth amendments to the federal constitution, and also because the transactions proven were clearly interstate commerce and protected by Section 8 of Article 1, of the federal constitution. This motion was overruled. Defendant then introduced its evidence, at the conclusion of which, it renewed the motion for a peremptory, which was again denied. Certain instructions were then offered by the defendant, which the court refused to give, but instead gave to the jury the following instructions:

"No. 1. The court instructs the jury that if they believe from the evidence to the exclusion of a reasonable doubt that the defendant, American Seeding Machine Company, before the filing of the petition herein, entered into or became a member of a pool, trust, combine, agreement, confederation, or understanding with the Hoosier Drill Company, Superior Drill Company, Kentucky Drill Company, Bickford & Hoffman Company, Buckeye Drill Company, or any of said companies, or another company or corporation, for the purpose of regulating, controlling or fixing the price of fertilizers, grain drills, seeders, transplanters, disk harrows, potato diggers, potato planters or the repairs of same, manufactured or produced, or to be manufactured or produced by them, or any of them, and that the purpose and effect of said pool, trust, combine, agreement, confederation, or understand-

ing, was to enhance the price of said fertilizers, grain drills, seeders, transplanters, disk harrows, potato diggers, or potatoe planters, or either or any of them, above their real value, and if the jury further believe from the evidence beyond a reasonable doubt that the defendant company, in pursuance of and while a member of or a party to, or in any way interested in said pool, trust, combine, agreement, confederation, or understanding, in Barren County, and within one year before the filing of the petition herein, to-wit: Within one year before November 16th, 1911, and under the same market conditions that existed before the advance, if any, in price of said machinery, or any of it, sold any fertilizer, grain drill, seeder, transplanter, disc harrow, potato digger, or potato planter, or transplanter, or any of them, or repair of same at more than their real value, then and in that event you should find the defendant guilty, and fix his punishment at a fine in any sum not less than five hundred dollars, and not more than five thousand dollars, in the discretion of the jury.''

''No. 2.    Although the jury may believe from the evidence to the exclusion of a reasonable doubt that the defendant entered into, or became a member of such pool, trust, or combine, as set out in instruction No. 1, and that within twelve months prior to November 16th, 1911, the defendant, while a member of such pool, trust, or combine, sold some fertilizers, grain drills, seeders, transplanters, potato diggers, or potato planters, mentioned in instruction No. 1, in Barren County, either itself, or through its agent at a greater price than said machine was sold at before the defendant became a member of such pool, trust or combine, as set out in instruction No. 1, yet if they believe from the evidence that the enhancement in the price of said machinery was due solely to the increased cost of labor or material, if any, in producing said machinery, they should find the defendant not guilty.''

''No. 3.    If the jury have a reasonable doubt of the defendant having been proven to be guilty you should find it not guilty.''

After argument, the case was given to the jury, and it, upon consideration, returned the verdict above indicated. Judgment having been entered thereon and the motion and grounds for new trial filed, heard, and overruled, the defendant prayed, and was granted, an appeal, and now seeks a reversal upon four grounds: First, be-

cause the acts of the legislature, under which the prosecution was being conducted, are in violation of the Fifth and Fourteenth amendments to the federal constitution; second, because the evidence clearly shows that the transaction complained of was an interstate transaction; third, because the evidence failed to show that appellant entered into any combination such as is inhibited by the statutes, that is, that the combination complained of did create a monopoly; and fourth, because the evidence failed to show that appellant had either sold, or offered to sell, any of its machines in Barren County.

The first ground, relied upon for reversal, to-wit: That Sections 3915 and 3941-a are violative of the Fifth and Fourteenth amendments to the federal constitution, was considered at length by this court, in International Harvester Co. v. Commonwealth, 131 Ky., 551. We adhere to the opinion there expressed and hold, for the reasons therein stated, that these sections of the Kentucky statutes are not in conflict with either the Fifth or the Fourteenth amendment to the federal constitution, or with any other provision thereof.

As to the claim that the transaction, out of which the prosecution arose, was an interstate transaction, it is conceded by counsel for appellee that, if it was, the case must be reversed; but, it is earnestly insisted that the contract itself shows that the sale was actually made in this State, whereas, counsel for appellant insist that no sale was made in this State, but that an order merely was taken for certain machines, which did not become effective until it was approved by the company at its office in the State of Indiana. The only evidence offered by appellee to show a sale in Barren County is the following writing, entered into between George D. Rogers, representing the appellant, and Dickey & Co., a firm of merchants at Glasgow, Kentucky:

"The American Seeding Machine Company, incorporated, of Richmond, Indiana, first party, hereby sells and Dickey & Co., of Glasgow, County of Barren, State of Kentucky, second party, hereby buys Hoosier Brand of agricultural implements at the prices and terms stated in this contract, and in the order hereto annexed. In case second party shall dissolve partnership or fail to pay when due any sums owing by it to first party, or for any cause, its financial responsibility shall become impaired, or is not acting in good faith, then said first party may at its option terminate this contract, and all

sums owing it by second party shall become immediately due and payable; and it is understood and agreed that the goods furnished under this contract, or proceeds thereof, shall be held for the benefit of first party as collateral security for the fulfillment of all obligations incurred hereunder.  It is understood and agreed by second party that first party is not to be held liable for any damage by inability to ship goods ordered under this contract, from causes beyond its control, such as strikes, fires, or any providential interference.  No agreements, verbal or otherwise not embodied in this contract shall be binding.  This contract is of a continuing nature, and shall cover all goods ordered during the current season of 1911, and shall not be valid until approved by first party at its office in Richmond, Indiana.

"In witness whereof, we have hereunto set our hands and seals this 26th day of Nov., 1910.  Territory, Glasgow and Vicinity.  Bank, Trigg National Bank.  Bank located at Glasgow, Kentucky.

"The American Seeding Machine Company, Incorporated,

By Geo. D. Rogers.

"Dickey & Co.

By W. E. Bybee,<br>H. T. Dickey,<br>E. Dickey.

"Less C. L. F. O. B. cars, Louisville, Ky.  Car lot F. O. B. cars, Glasgow, Ky., if shipped in combination.  Terms: Spring sales—Net August 1, 1911, subject to discount for cash, of 7 per cent May 1st or 6 per cent June 1st, 1911.  Fall sales—Net Jan. 1, 1912, subject to discount for cash of 7 per cent Oct. 1st, or 5 per cent Nov. 1st, 1911.  Repairs—25 per cent from printed lists, subject to regular cash discounts.  Full settlement to be made by cash or note not later than June 1st, for spring sales, or November 1st for fall sales, as per terms above.  5 Fert. 6x8 Sqe. Disc. & G. S. A. F., F. C. F W. W. Horse Hitch $61.50, 2 1-11. 4 Frt. One Rev. Dis & Com. Drill B. C. $10.50.  Order entered Dec 3, 1910, C. M. Haworth.  Quantity Rebate—Two horse and larger wheat drills.  If second party sells and settles in cash or his purchaser's notes in accordance with contract rebate will be allowed at time of settlement as follows: 5 to 9 inclusive, two horse and larger wheat drills $ .50 each; 10 to 14 inclusive, two horse and larger wheat drills $1.00 each.  15 to 19 inclusive, two horse and larger wheat drills

$1.50 each. 20 or more two horse and larger wheat drills $2.00 each. No rebate allowed on drills not settled for in cash or farmer's notes. Different classes of machines cannot be combined to obtain rebate. The American Seeding-Machine Co. Incorporated, Richmond, Ind., U. S. A.''

Each party looks to this writing to establish its position.

The second and fourth grounds, relied upon for reversal, may be considered together, for, if no sale was made in Kentucky as evidenced by the foregoing writing, it is admitted that this transaction was an interstate transaction and not controlled by the sections of the Kentucky statutes quoted.

As the writing states, it was of a continuing nature and covered not only the negotiations between the parties for the machines then needed by Dickey & Company, but also established the basis upon which their dealings, throughout the year, were to be continued. The evidence shows that appellant company furnished printed blanks, upon which these agreements with its patrons throughout the country were recorded. As they formed the basis of its contracts with its patrons, it may be assumed that they were prepared with that care which their importance demanded. As the writing possesses none of the characteristics of an order, the natural presumption is that it was not intended as an order. It has all the distinguishing features of a completed contract, and none of the ear-marks of an order. It will be observed that it designates appellant as ''party of the first part'' and says ''it sells,'' and then designates Dickey & Company as ''party of the second part'' and says they ''buy'' certain designated machinery. The trade regulations governing the parties during the ensuing year are then set out, and the writing then closes with this statement:, ''No agreements, verbal or otherwise, not embodied in this contract shall be binding. This contract is of a continuing nature, and shall cover all goods ordered during the current season of 1911, and shall not be valid until approved by first party at its office in Richmond, Indiana.'' It was signed by each party. An order is merely an offer; it is signed by the would-be purchaser only; it is merely a request, on his part, that he send him, sell him, or ship him, the goods desired; and this request is usually couched in language appropriate to express or convey such desire, such as

"please send me," "please ship me," or "I wish to buy, etc.;" or, where the order has been placed through a soliciting agent of the seller, the natural and usual language would be, "I have ordered through your Mr. ................., the following goods, etc.;" whereas, a contract is an agreement between two parties and results whenever, in their negotiations, their minds meet —that is, when the offer to sell or buy, as the case may be, which one makes, is accepted by the other. Here, we have a written statement saying, as plainly as language can express it, that appellant "sells" and Dickey & Company "buy" designated machinery. If this language means anything, it means that the contracting parties had agreed, their minds had met, and the transaction closed. Throughout the writing, it is termed a contract, and it is a contract, unless the agent, Rogers, did not have authority to make it.

Just what authority Rogers had, Dickey & Company did not, of course, know. His principal would naturally want to inspect his agreements made for it with its customers, and to see that he was not obligating it for things which he had no right or authority to obligate it; hence the clause at the close of the writing: "This contract * * * * * shall not be valid until approved by first party at its office in Richmond, Indiana," was inserted. Under this clause, appellant had the right, upon presentation, either to approve or reject the contract, dependent, of course, upon whether or not it was satisfied with its terms and its agent, Rogers, had not exceeded his authority in making it. It was, in due time, presented to the company, and upon its receipt, it wrote Dickey & Company the following letter: "Your contract with our traveler, Geo. D. Rogers, has been received accepted and approved. Copy enclosed for you to file for future reference." How did appellant then regard the writing? Clearly, not as an order, for the letter says, "Your contract with our traveler, Geo. D. Rogers, has been received, accepted and approved." An order might have been received and accepted, but one would hardly write that an order had been approved; nor would one, at all familiar with business transactions, refer to an order as a contract; nor would appellant, if it had regarded the writing as an order, have referred to it as a contract made with the traveler, Rogers. Not only does the writing show that it was a contract, but the letter of the company, acknow-

ledging its receipt, confirms this fact; and this letter, ratifying the contract, had the effect of making valid and binding upon appellant the contract, into which its agent, Rogers, had entered with Dickey & Company, in Glasgow, Barren County, Kentucky, and the contract speaks as of the date when it was made in Glasgow and not as of the date of its ratification in Richmond, Indiana. Theobald v. Hare, 8 B. Mon., 39; Kirkpatrick v. Pease, 202 Mo., 471; 101 S. W., 651; Commercial Bank v. Warren 15 N. Y., 577; and Story on Agency, section 244; Bell v. Waynesboro Borough, 195 Pa. St., 299.

Appellant's contract evidences a sale by it of certain machinery in Glasgow, Barren County, Kentucky, within the time covered by the suit, and the sale having been completed in Kentucky, the claim that it is an interstate transaction is of no avail.

The only remaining question is, did the organization of appellant company violate the provisions of the Kentucky Statutes under consideration? The evidence shows that, prior to the formation of appellant company, its various constituent companies were actively engaged in selling seeding machinery in Kentucky and were competitors in the sale of seeding machines. In fact, they were practically the only seeding machine companies doing business in this State. One or two other companies are mentioned, in an incidental way, as doing business in Kentucky, but, even from a casual reading of the record, it is apparent that the companies that entered into the combination, resulting in the organization of the appellant company, were the principal seeding machine companies doing business in that part of the State, at least, to which the evidence addresses itself, and the rivalry among them for business was strong. Each company fixed its own prices; some were higher than others; each had its own corps of field agents selling its machines. Immediately upon the organization of appellant company, all competition between them ceased, and uniform prices were established upon their goods.

It is said that there are some fifteen or twenty other seeding machine companies doing business in the United States, and that the business of appellant's constituent companies, at the date of its organization, was but forty-five or fifty per cent of the total business done by seeding machine companies in this country. All this may be true, and yet, the fact remains that, at the date upon which the combination was effected, appellant's constituent com-

panies were the principal seeding machine companies doing business in this State, and their combination had the effect of removing practically all competition in this business and to give to appellant undisputed control of the seeding machine business in Kentucky. Since the organization of appellant company, the only competition that has existed is that between its agents, in their efforts to see who can sell the most machines, but all for appellant and at a uniform price. No other company is shown to have been an active competitor of appellant company, in this State, since its organization. It may be, and doubtless is, true that there are other seeding machine companies capable of supplying large territories with needed seeding machinery, but the evidence does not show that they are competitors for the Kentucky trade, or engaged in the manufacture of seeding machinery suitable to the wants and necessities of the Kentucky farmer. We are not concerned with the result which this combination produced elsewhere, but solely with what effect such combination has had upon trade conditions here in Kentucky, and the evidence undoubtedly shows that, since its organization, appellant has had a practical monopoly of the seeding machine business in this State and was enjoying such distinction at the time this litigation was instituted. Such combinations are not favored in law and, where not prohibited by statute, are condemned as against a sound public policy and as operating in restraint of trade. Merchant's Ice & Cold Storage Co. v. Rohrman, 138 Ky., 530. But, notwithstanding appellant has acquired such control of the seeding machine business, it is not subject to the penalties prescribed by the statutes under consideration, unless its purpose, in thus acquiring control, was to raise the price of the machines, which it manufactured, above their real value, and we, therefore, pass to a consideration of this question.

The evidence shows that, when the appellant company was created in 1903, the Hoosier 6x8 fertilizer disc drill was selling for $52.00, and the 8x8 drill, for $60.00. The Superior drills, of like size, were then selling for $54.00 and $62.00 respectively; the Empire, for $56.50 and $64.50; the Kentucky, for $52.00 and $60.00; and the B. & H., for $58.00 and $66.00 respectively. In the standardization of prices, appellant reduced the price of all these drills to that fixed for the Kentucky and Hoosier, to-wit; $52.00 and $60.00. These prices remained in

force during the balance of the seasons of 1903 and 1904. The following year, the price of the smaller of said drills was raised from $52.00 to $54.00, a flat raise of $2.00 per drill on all 6x8 drills. In 1907, a flat raise of $1.00 per drill on the 6x8 and 8x8 drills was made, making the price of these drills $55.00 and $61.00 respectively. In 1908, a flat raise of $4.50 was made on the 6x8's, and a like raise on the 8x8's. These prices were maintained until 1911, when another flat raise of $2.00 per drill was made, so that, in 1911, the Kentucky and Hoosier drills which, in 1903, sold for $52.00 and $60.00 respectively, were selling at $61.50 and $67.50 respectively, a raise of $9.50 upon the smaller, and $7.50 upon the larger, of said drills. During this time, according to the testimony of appellant, the business had increased fifty per cent and in the financial statement filed, it appears that the sales of the company increased from an average of $276,000, in round numbers, per month, in 1903, to an average of $413,000 per month, in round numbers, in 1911. The evidence further shows that the cost of the material which entered into the construction of these machines, while varying somewhat during this interim, was in 1903 practically as high as it was in 1911. Iron, which constitutes the greater part of the material used in their construction, was, if anything, cheaper in 1911 than it was in 1903, while wood was somewhat higher. The price of labor had increased materially in this time, but the increased price of labor required in the manufacture of these machines had been more than offset by the saving to the company in the marketing of the machines. One field man, in 1911, did the work which, prior to the combination, several were required to do. Not only so, but the business had been centralized, old plants abandoned and new ones built at places where transportation facilities were better and material more easy of access. So that, when the evidence, as a whole, is considered, it is apparent that machines could, in 1911, be produced at less cost, per machine, than they were in 1903. There is no showing as to what the actual cost of these machines is, per machine. This information could doubtless have been furnished by appellant, but it did not see fit to do so. Appellee contented itself with showing that the cost of the materials, which entered into the construction of these machines, was not materially higher in 1911 than it was in 1903; that appellant had effected a great saving in the marketing of its machines; and that it was enabled,

by reason of the increased output, together with certain improvements looking toward the centralization of its plants and the standardization of certain parts of its machines, to produce them at a less cost, per machine, than it did in 1903. Basing its argument upon this idea, it is insisted that the flat raises in the price of these machines, from time to time, during the interval between 1903 and 1911, were wholly unjustified by conditions, and were evidently made in furtherance of the purpose for which the combination was effected.

Since the combination was formed, appellant's business has been greatly enlarged and much improved. The record is silent as to how much money has been required to make these extensions and betterments. It has also pressed its business into new territory, and, during these years, has been adding new fields for the sale of its machines. Just how much money has been expended in this way is not shown, but it is apparent that, inasmuch as old plants have been abandoned and new and larger ones have been constructed and field operations have been greatly enlarged and the business extended, much money has been used for these purposes. The record shows that but $325,000 of new money has been put into the business, since its organization, and hence, the bulk of these improvements and betterments have necessarily been paid for out of the earnings of the company. The financial statement furnishes no basis for determining how profitable the business has been, further than that it shows that, during the years covered by its corporate existence, it has regularly, with the exception of one year, paid a dividend upon its stock, and in 1911 had accumulated a surplus of $1,600,000 as against $116,000 in 1903. The record shows that the sales, in 1911, amounted, in round numbers, to $4,956,000, and for the same year the expenses were $1,244,000. The report does not show what was done with this sum representing the difference between the sales and the expenses; nor are we advised as to what items are covered by the term "expense." If the meaning of this term, as used by appellant in the conduct of its business, is as broad and comprehensive as that which is generally given to it, then it should include every item of expense of every character and would represent not only the cost of the labor and material used in the manufacture of these machines, but also the cost incident to their marketing; and, if this is true, the profit realized by appellant in 1911 was simply enormous. If

this is not true, and other items of expense were incurred by appellant which were not included in this account, we are furnished no guide by which we can determine what profit was realized out of the business. In the financial statement, there is an item termed ''gross revenue for 1911'' amounting to $2,082,000. We do not know how the figures, making this item, are arrived at. If the sales account represents the money received by appellant for the sales of its machines during 1911 and it had no other source of revenue, then this item should be the gross revenue, that is, the total receipts, and from it should be deducted the expense, and the difference, less a proper charge for depreciation, would be the net earning of the company for that year. If the account was presented in this form, we could readily determine whether or not appellant's machines were sold, or offered for sale, at a price above their real value. But, having been furnished with no means of ascertaining that the real value of the machines, in 1911, was more than it was in 1903, the conclusion is inevitable that the raise in the prices of these several machines has not been justified by any change in conditions, due to the increased cost of material or to the advance in the price of labor. If these machines were selling at their real value in 1903, and in the absence of any showing to the contrary, we presume they were— then the effect of the combination was to advance the price, during the several periods when these advances were made, and to maintain that price in 1911 above the real value of said machines. Upon this showing the jury was warranted, under the instructions, in finding that the purpose of the organization of appellant was to raise the price of its products above their real value.

The instructions given presented the issue, and, as the trial is shown to have been conducted without substantial prejudice to apellant's rights, the judgment is affirmed. The whole court sitting.