## REBSAMEN FORD, Inc. *v.* Anna Irene KING

74-22                                    509 S.W. 2d 543

Opinion delivered May 13, 1974
[Rehearing denied June 17; 1974.]

*Moses, McClellan, Arnold, Owen & McDermott*, for appellant.

*Alexander, Southern, Vess & Kelly*, for appellee.

LYLE BROWN, Justice. Appellee Anna Irene King instituted this suit to recover possession of an automobile which she intended to trade in on a new car. She also sought $2500 damages for alleged wrongful conversion of the car. Appellant responded by alleging that appellee had executed a purchase order for a new car and traded in the old car as a down payment. The jury awarded damages of $1220.

Appellee, being interested in trading her 1970 model car for a new 1972 model, went to appellant's place of business on Saturday afternoon, August 19, 1972. Salesman Luther Tull showed Mrs. King several cars and she found one she liked. After considerable discussion about prices, Tull obtained the assistance of the sales manager, James D. Puckett. The trade-in allowance, the balance to be paid, and the

amount of monthly installments were agreed upon. Thereupon a document styled "Retail Buyers Order" was executed by appellee and accepted in writing by Puckett on behalf of appellant. At the bottom of the order was a space for a finance company to approve the credit. It being late on Saturday afternoon the office of the Ford Motor Credit Company was closed, and it was anticipated the credit company would be contacted the following Monday. Appellee left her 1970 trade-in with appellant and was furnished a demonstrator to drive. The facts thus far recited are undisputed.

In support of her compalint appellee testified, along with her son and the salesman, Luther Tull. Appellee testified she had never before bought a car on time payment and that she did not understand the terms of the purchase order. "I thought it was to check my credit; and if that was okay, I could take it . . . . I did make a deal to trade if my credit was alright."

Appellee testified she talked to several people over the weekend and that on Monday morning around 9:00 o'clock she called Mr. Puckett and told him she could not take the new car because she was not financially able. Then on Tuesday morning appellee delivered the demonstrator back to appellant's place of business. She requested her 1970 car be returned to her and appellant declined to do so, taking the position that the parties had made a binding sale and purchase. (Three months later the car was returned to appellee "without prejudice".)

Charles Russell King, appellee's son, testified he accompanied his mother on August 19 to Rebsamen's. He said his testimony would be the same as that of his mother. He also said that while his mother's car sat on appellant's lot for three months a hole was knocked in the gas tank and the motor rusted.

Witness Luther Tull, the car salesman, testified he had been in the automobile business since 1929; that at the time of the subject transaction he had worked for appellant for three years; and that he had an opinion about the amount appellant's 1970 car depreciated while it was on appellant's lot. He estimated the depreciation to be $700. With regard to

the purchase order signed by appellee he said: "I told Mrs. King this was a buyer's order and a contract, but it wasn't a contract where I worked before." He said he heard Mr. Puckett tell appellee she was singing a contract "if we get the title and pay-off". He said the purpose of sending appellee home in a demonstrator "was to lock up the deal so she couldn't go someplace else and buy a car".

The first witness for appellant was Gene Beavers, appellant's business manager. He said the buyer's order signed by appellee was accepted by appellant and by the finance company. However, he stated that the date the finance company approved appellee's credit was not shown on the buyer's order, nor did he have knowledge as to when it was accepted. He said that appellee did not sign the finance company's credit contract.

James D. Puckett testified he was the finance manager for appellant at the time of the transaction. He said he had the duty to "call the deal to the finance company and wait for their approval". Luther Tull called on the witness to assist him with the trade with appellee. The witness rejected the offer made by Mr. Tull and after conferring with the used car manager, Puckett made an offer to trade with appellee for a difference of $2400. Puckett said the figure was acceptable to appellee, that she signed the buyer's order and Puckett signed for appellant. "I told her that I would not be able to call on the credit because it was Saturday and I probably called the deal in around 8:15 or 8:30 Monday morning and informed Mrs. King that everything was set to go." He said he may have spoken to appellee on the telephone Monday afternoon. The witness said credit approval is handled by telephone and ofttimes takes no more than thirty minutes to get a report. Gene Beavers, Rebsamen's Credit manager, said that credit company did not open until around 9:00 a.m.

The title certificate to the trade-in was not delivered to appellant on Saturday, August 19. In fact it was in the hands of the Bank of Cabot to whom appellee owed a balance of $400 on the car. Appellee had previously given the money to a relative to pay the bank but it was not paid. Appellee informed Puckett that the title was clear. Puckett, who apparently called the bank on Monday, was at that time informed of the balance owed.

Appellant takes the position that as a matter of law the

buyer's order executed on August 19 was a contract of sale and purchase; that being true, appellant urges, it had a reasonable length of time in which to secure the approval of a responsible finance company.

The instrument here involved is titled "Retail Buyers Order". Immediately above the signature appears the following paragraph:

> This order is not valid unless signed and accepted by dealer and approved by a responsible finance company as to any deferred balance.

To some extent the foregoing language when considered with the other language in the instrument is ambiguous. It can be construed both as a contract to buy upon condition of credit approval of a responsible finance company as to the deferred balance and also as an offer to purchase requiring not only the acceptance by the "dealer" but also the approval of a responsible "finance company as to any deferred balance" before there is a valid contract.

"The right, before acceptance, to revoke an ordinary offer, or an offer not supported by consideration is unquestioned." See 17 Am. Jur. 2d Contracts § 35. It is also " . . . fundamental that an acceptance must comply with the terms of the offer—that is, in order to form a contract, the offer and acceptance must express assent to one and the same thing, and there must be no substantial or material variance between them." See 17 Am. Jur. 2d Contracts § 62.

The term "order" has many meanings but when used in the phrase "Retail Buyers Order", it can take on the connotation of an offer by a would-be purchaser; *American Seeding Machine Co.* v. *Commonwealth*, 152 Ky. 589, 153 S.W. 972 (1913). Consequently, if the connotation of offer be substituted for the word "order" in the language of the instrument here involved then it would read:

> This offer is not valid [a binding contract] unless:
> (1) signed and accepted by dealer and
> (2) approved by responsible finance company as to any deferred balance.

The jury, because of the ambiguity of the language involved, had a right to construe the language of the instrument in that light. When read in that light the instrument would remain an "offer" until there was both an acceptance by the "dealer" and an approval by a "responsible finance company as to any deferred balance". When viewed in this light the approval of a "responsible finance company as to any deferred balance" was a condition to the acceptance of the offer or order as a contract. Now of course, parties can enter into a binding contract to sell and purchase when the purchaser's credit is approved by a responsible finance company and in those instances the dealer would have a reasonable time within which to secure the approval of a responsible finance company. However, as demonstrated above, the language here is susceptible of two interpretations and we can not say that the jury erroneously concluded that the approval "by a responsible finance company" was a term or condition prerequisite to the acceptance of the offer as a contract between the parties. It was also a jury question as to which came first, the acceptance by the finance company or the rejection by appellee.

We also think it is significant that the deal could not have been closed in accordance with the financing terms expressed in the buyer's order; that was because at the time the order was executed on Saturday neither party was aware that the indebtedness existed at the Bank of Cabot. Therefore, if the finance company had paid the bank, then that amount, $400, would have to be added to the contract. It may well be that when appellee discovered the money she posted to pay the bank had not been paid, she decided that she was not financially able to consummate the deal.

Affirmed.

HARRIS, C.J., and HOLT, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I dissent because, in my opinion, the instrument in question was just exactly what it was titled, "Retail Buyers Order". It was accepted by both Mrs. King and Rebsamen Ford, Inc., and the carrying out of its provisions was subject only to the approval of a finance company. The transaction occurring on Saturday afternoon, no contact could be made with the Ford

Motor Credit Company since it had closed for the day. The testimony reflects that the credit company was contacted on Monday, although the exact time is not established; it thus is not clear whether Mrs. King advised Rebsamen that she was not going to purchase the car before or after the credit company was called. However, that particular point is immaterial to me since, in my view, Rebsamen was entitled to a reasonable time in which to obtain the approval of a responsible finance company, and since the Rebsamen company representative took action on the very first business day following the execution of the agreement, I feel that the contract was binding upon appellee. In the case of *Gentry* v. *Hanover Insurance Company*, 284 F. Supp. 626, the United States District Court for the Western Division of Arkansas, Hot Springs Division, through Judge John E. Miller, Senior District Judge, quoted 17 C.J.S. Contracts § 43, p. 686, as follows:

> "Where an agreement is made subject to the consent of a third party, it must be looked on as a conditional agreement, dependent on such consent being given within a reasonable time, in default of which the agreement must be taken not to have become effective . . ."

The Court of Appeals of Kentucky, in the case of *Green River Steel Corp.* v. *Globe Erection Company*, 294 S.W.2d 507, stated the same view, as follows:

> "The general rule is that where an agreement is made, subject to the consent or approval of a third person, it must be looked on as a conditional agreement, dependent on such consent being given within a reasonable time, in default of which the agreement must be taken not to have become effective. [Citing cases.]"

My basic disagreement with the majority is simply that, under my interpretation, the contract was not an "offer", but was an "order", subject only to approval by the credit company. Since appellant, which, in my opinion, was the only party having the right to raise the question of credit approval, is satisfied, I would hold the contract binding and reverse the judgment.

I also suggest that, under this decision by the majority, automobile dealers had best re-examine their customer order agreements.

HOLT, J. joins in this dissent.